UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GAIL VINCENT,

                  Plaintiff,

    v.

BELINDA STEWART, et al.,

                  Defendants.

Case No. C16-5023-RBL

REPORT AND
RECOMMENDATION

Noted for **January 16, 2020**

This case is before the Court on remand after a decision from the United States Court of Appeals for the Ninth Circuit. After remand, defendants filed a second motion for summary judgment. Dkt. 118. In this motion, defendants contend they provide a diet that meets plaintiff's religious and health needs, and does not burden the exercise of his religion. Plaintiff opposes this second summary judgment motion and asserts that evidence from two of defendants' witnesses – Erin Lystad, and Scott Light – should be stricken because this evidence was not disclosed timely in discovery; and plaintiff argues that genuine disputes of material fact exist regarding whether the nutritional content of the meals offered by defendants causes violations of the First Amendment Free Exercise Clause and the Religious Land Use for Institutionalized Persons Act (RLUIPA). Dkt. 120.

This matter has been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule

MJR 4(a)(4). For the reasons set forth below, this Court should deny defendants' motion for summary judgment.

Plaintiff is an inmate at Stafford Creek Corrections Center (SCCC). Plaintiff's Second Amended Complaint asserts claims against defendants Washington State Department of Corrections (DOC)[1], Brent Carney (DOC Dietary Services Manager) Belinda Stewart (DOC Correctional Program Administrator), Bernard Warner (DOC Secretary), Joe Williamson[2] (Facility Food Manager at SCCC), "Pat Doe #1" ("Religious Dietary Final Policy Makers") and "Pat Doe #2,[3] ("Religious Dietary Final Policy Makers"). [4] Dkt. 23. The Second Amended Complaint asserts claims under the First, Eighth, and Fourteenth Amendments, and the Religious Land Use for Institutionalized Persons Act (RLUIPA), related to defendants' alleged failure to provide him with a diet that meets his religious and medical needs. *Id.* Plaintiff alleges he is an "orthodox Hare Krishna devotee who adheres to a conservative ISKCON way of religious belief and practice." *Id.*, at 5.

Plaintiff indicates his Orthodox Hare Krishna religion requires him to eat a vegetarian diet with fresh dairy proteins daily. *Id.* Plaintiff notes that DOC offers a vegan diet but that this does not provide him with fresh dairy as required by his religion. *Id.* He further claims that he has high blood pressure, high cholesterol and is overweight and

---

[1] During appeal, plaintiff conceded the DOC was properly dismissed as a defendant in this matter. Dkt. 115 at 186, Defense Counsel Decl., Attach. D., Ninth Circuit Court of Appeals Memorandum.

[2] The Court notes that defendants filed a Statement of Death with respect to defendant Joe Williamson on April 24, 2017. Dkt. 84.

[3] The Court notes that it does not appear that defendants identified in the Second Amended Complaint as ""Pat Doe #1, Religious Dietary Final Policy Makers" and "Pat Doe #2" were ever sufficiently identified in this action in order to be served.

[4] Plaintiff's Second Amended Complaint names these defendants in their individual and official capacities. Dkt. 23.

has been prescribed the "lighter fare" or "metabolic" diet by his medical providers but that this diet contains meat which violates his religion. *Id.* He claims he has been forced to "choose between a healthier diet and his religion," and has been "forced to forego his religious dietary proscription of not eating meat in order to prevent further heart problems and ultimately death." *Id.*, at 5.

All of plaintiff's claims for damages have been dismissed under qualified immunity doctrine. *Vincent v. Stewart*, 757 Fed.Appx. 578 (9th Cir. 2018). The plaintiff's equitable relief requests are:

> 52. Injunctive (preliminary and permanent) relief forcing the defendants to uphold their former policy of allowing lacto-vegetarianism while also mixing it with the metabolic diet. 53. Declaratory for the same as paragraph 52 above. 54. Declarative relief stating that policy DOC 560.200 where the DOC is requiring an inmate to acquire outside sponsorship in order to receive religious needs is unconstitutional whether through the Establishment Clause which the plaintiff presents or otherwise laws. 55. Declaratory relief stating that the "Vegan" diet is an extreme solution to the vegetarian class(es) of inmates because most are not vegans, so this policy is arbitrary and burdensome on that class. . . . 57. Any other equitable damages this court sees appropriate.

Dkt. 23 at 18-19; *see also*, Dkt. 23 at 7 (suing to accomplish a remedy for the defendants' acts, omissions, and policies that caused a deprivation of "one pint of fresh milk daily" as well as "deliberate removal of the lacto-vegetarian diet and the no mixing of the therapeutic and religious diets", and forcing ingestion of meat), 12 (identifying and challenging DOC Policy 560.200 IV(5)(a) and (b) "which prohibits the mixing of the therapeutic diet prescribed by the plaintiff's provider and his religious dietary needs – and specifically the proscription of meat. The policy and Final Policy Makers have prevented the plaintiff from getting a diet that is healthy and in compliance with his religion").

Defendants' current summary judgment motion contends that plaintiff's First Amendment and RLUIPA claims should be dismissed. Dkt. 118. They allege that on February 1, 2019, they made a new diet available to the plaintiff, the "Milk Mainline Alternative Diet" (MMAD). *Id.* Defendants argue that this diet meets plaintiff's religious and medical needs, and that plaintiff therefore cannot demonstrate any substantial burden on the practice of his religion. *Id.*

<u>DISCUSSION</u>

Defendants previously moved for summary judgment and dismissal of plaintiff's claims and asserted qualified immunity. Dkts. 78, 96, 97. All of plaintiff's claims were dismissed; this Court issued an order granting summary judgment in favor of the defendants in June of 2017. *Id.* Plaintiff appealed the dismissal of his claims to the Ninth Circuit Court of Appeals and was appointed counsel by that Court. *See* Dkt. 115, Attach. B. In the course of his appeal, plaintiff, through counsel, conceded that the dismissal of the DOC from the action was proper and declined to continue appeal of any Eighth Amendment or Fourteenth Amendment Due Process claims. Dkt. 115 at 110; *Vincent v. Stewart*, 757 Fed.Appx. 578 (9th Cir. 2018).

**A. Scope of the Ninth Circuit's Mandate on Remand**

The Ninth Circuit affirmed this Court's decision granting qualified immunity to the defendants on plaintiff's constitutional claims for damages and the dismissal of plaintiff's Fourteenth Amendment Equal Protection claims. *Vincent*, 757 Fed.Appx. 578. The Ninth Circuit reversed this Court's grant of summary judgment on plaintiff's RLUIPA and First Amendment claims for injunctive and declaratory relief. *Id.* The matter was remanded and this Court issued a new pretrial scheduling order. *Id.*; Dkt. 109.

Plaintiff argues that this Court is bound by the Ninth Circuit's determination that the plaintiff's religious beliefs are substantially burdened, as a matter of law, by the lighter fare diet (also known as the metabolic diet) that has been offered by defendants. Dkt. 120. Plaintiff points to the language of the Ninth Circuit's decision that "[f]urthermore, the defendants' refusal to provide Vincent with a metabolic diet that meets his religious need substantially burdened his religious beliefs", as being a limitation on this Court's power to consider defendants' proffered evidence on summary judgment. *Id.*; *Vincent*, 757 Fed.Appx. 578.

When a case is decided by an appellate court and the remedy is a remand for further proceedings at the district court, the district court is required to proceed in a manner that respects the mandate; the mandate of the appellate court controls all matters within its' scope. *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1497 (9th Cir. 1995). The mandate rule allows the district court to consider any issue that has not been expressly or impliedly decided on appeal. *Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 168-69 (1939); *Firth v. U.S.,* 554 F.2d 990 (9th Cir. 1977). When the appellate court bases its' decision on a review of all the evidence and consideration of the same arguments presented to the district court, the mandate does not allow the district court to revisit these issues of law and fact that were decided on appeal. *Firth v. U.S.,* at 993-94; *see also, Lummi Tribe of Lummi Reservation, Washington v. United States,* __ Fed. Appx. __, No. 2018-1720, 2019 WL 5061386 (Fed. Cir. October 9, 2019) (applying rule of mandate to allow plaintiffs to argue issues that were not implicitly decided on appeal; "implicitly" means "necessary to our disposition of the appeal").

In this case, the rule of mandate means, as it relates to the defendants' second motion for summary judgment, this Court should refrain from revisiting the following issues that were either explicitly or implicitly resolved on appeal[5]:

1. Under RLUIPA, a single incidence of dietary deviation committed by plaintiff does not undermine plaintiff's contention that Vincent's religious belief (Orthodox Hare Krishna) is sincerely held;

2. Under RLUIPA, there is a genuine dispute of material fact whether cheese products offered in the commissary would be sufficient to satisfy Vincent's religious dietary restrictions, (Dkt. 103 at 4);

3. Under RLUIPA, viewing the evidence in the light most favorable to the plaintiff, the defendants substantially burdened Vincent's religious beliefs by refusing the provide him with a "metabolic diet that meets his religious needs" and defendants failed to demonstrate their failure to provide Vincent with such a diet was "in furtherance of a compelling governmental interest" and the "least restrictive means of furthering that compelling governmental interest"; (*Id.* at 4); 42 U.S.C. § 2000cc-1(a), 2(b);

4. Under the First Amendment, viewing the evidence in the light most favorable to the plaintiff, the defendants substantially burdened Vincent's religious beliefs by refusing the provide him with a "metabolic diet that meets his religious needs" and defendants' allegations of significant additional labor, time, and staff that would be required to accommodate plaintiff's religious

---

[5] The Court notes that the Ninth Circuit's decision is based on the factual record developed up to the date of the pleadings filed with respect to defendants' first summary judgment motion. *See,* Dkt. 103 at 3, Dkt. 23, Second Amended Complaint at 5-19, Dkt. 46, Dkt. 58, Dkt. 61).

dietary requirements are conclusory and inadequate to satisfy the *Turner v. Safley,* 482 U.S. 78 (1987) factors[6], (*Id.,* at 5).

## B. Relevant Legal Standards

### a. Summary Judgment Standard

Summary judgment is supported "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP) 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine dispute concerning a material fact is presented when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

---

[6] In determining whether a governmental regulation that substantially burdens an individual's exercise of their religion is "reasonably related to legitimate penological interests" the Court must consider the four-part inquiry set forth in *Turner v. Safley*, 482 U.S. 78 (1987). Under Turner, "[f]irst, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and the governmental objective itself must be a legitimate and neutral one. A second consideration is whether alternative means of exercising the right on which the regulation impinges remains open to prison inmates. A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (citing *Turner*, 482 U.S. at 89–91). The Ninth Circuit specifically held in this case that defendants' allegations were inadequate to satisfy the third and fourth *Turner* factors. Dkt. 115 at 110, Attachment B at 18; *Vincent v. Stewart*, 757 Fed.Appx. 578 (9th Cir. 2018); Dkt. 118.

1    When the Court considers a motion for summary judgment, "[t]he evidence of the

2    non-movant is to be believed, and all justifiable inferences are to be drawn in [their]

3    favor." *Id.*, at 255. Yet the Court is not allowed to weigh evidence or decide credibility.

4    *Anderson v. Liberty Lobby, Inc.*, at 255. If the moving party meets their initial burden, an

5    adverse party may not rest upon the mere allegations or denials of his pleading; his or

6    her response, by affidavits or as otherwise provided in FRCP 56, must set forth specific

7    facts showing there is a genuine issue for trial. FRCP 56(e)(2). The Court may not

8    disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck &*

9    *Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

10    In response to the motion for summary judgment, the nonmoving party is

11    required to present specific facts, and cannot rely on conclusory allegations. *Hansen v.*

12    *U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific

13    facts that are presented by the non-moving party, considered along with undisputed

14    context and background facts, would show that a rational or reasonable jury might

15    return a verdict in the non-moving party's favor based on that evidence. *Emeldi v.*

16    *University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

17                          **b. 42 U.S.C. § 1983**

18    The elements of a cause of action under Section 1983 for deprivation of a federal

19    constitutional or statutory right are: (a) the conduct (act, omission, or policy) complained

20    of was committed by a person acting under color of state law, and (b) the act, omission,

21    or policy caused a deprivation of a right, privilege, or immunity secured by the

22    Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535

23    (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986); *McRorie*

24

25

*v. Shimoda,* 795 F.2d 780, 783 (9th Cir. 1986) (describing elements of official capacity

lawsuit under Section 1983 and the nature of causation for a policy-related claim

against state officials); *see also,* Ninth Circuit Civil Pattern Jury Instructions 9.1, 9.2, 9.3,

9.4 (describing the elements of a Section 1983 claim against individual defendants, for

direct or supervisory conduct in their individual capacity).

### c. RLUIPA

RLUIPA provides in relevant part that:

> No government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution ... even if the burden results from a
> rule of general applicability, unless the government demonstrates that imposition
> of the burden on that person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental
> interest.

42 U.S.C. § 2000cc-1. The term "religious exercise" includes "any exercise of religion,

whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §

2000cc-5(7)(A).

Under RLUIPA, plaintiff "bears the initial burden of going forward with evidence to

demonstrate a prima facie claim" that the challenged state action constitutes "a

substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418

F.3d 988, 994-95 (9th Cir. 2005). To be considered a "substantial burden," the

challenged state action "must impose a significantly great restriction or onus upon such

exercise." *Id.*, at 995. A "substantial burden" occurs when the state "'denies [an

important benefit] because of conduct mandated by religious belief, thereby putting

substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"

*Id.*, (*quoting Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707,

717-18 (1981)).

If the plaintiff meets this burden, the state then must prove that "any substantial burden" on the "exercise of his religious beliefs is both 'in furtherance of a compelling governmental interest' and the 'least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000cc-1(a), citing 42 U.S.C. § 2000cc-2(b)) (emphasis in original). The "least-restrictive-means" standard is "exceptionally demanding" and requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Burwell v. Hobby Lobby*, 573 U.S. 682, 728 (2014). RLUIPA "is to be construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008).

"RLUIPA, passed after the Supreme Court's decisions in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard under *Turner* which, as discussed below, applies to challenges brought under the First Amendment. *Shakur*, 514 F.3d at 888 (citing *Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir. 2005) (in enacting RLUIPA, Congress replaced "'the legitimate penological interest' standard articulated in *Turner v. Safley*, 482 U.S. 78 (1987), with the 'compelling governmental interest' and 'least restrictive means' tests codified" in RLUIPA)).

### d.  First Amendment

As with RLUIPA, under the First Amendment, "[a] person asserting a free exercise claim must show that the government action in question substantially burdens

the person's practice of her religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). To show that a First Amendment right to free exercise of religion has been violated, a prisoner must demonstrate a burden to a sincerely held belief that is rooted in religion. *Shakur*, 514 F.3d at 884. To "substantially burden" the practice of an individual's religions, the interference must be more than an inconvenience, *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), or an isolated incident or short-term occurrence, *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998) (short-term and sporadic intrusion upon a pre-trial detainee's prayers did not constitute a substantial interference with detainee's religious practice). "[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are insufficient to state a claim under the free exercise clause. *Lovelace v. Lee*, 472 F.3d 174, 194 (4th Cir. 2006); *see also Camacho v. Shields*, 368 F. App'x 834, 835 (9th Cir. 2010) (interruption of inmate's prayers on one occasion did not constitute a substantial burned on inmate's free exercise of religion); *Uhuru v. Hart*, 2009 WL 3489376 at *12 (C.D. Cal. Oct. 27, 2009) (requiring prisoner to remove his religious head covering on one occasion was not a substantial burden on his religious practice); *McDaniels v. Stewart*, No. 315CV05943BHSDWC, 2018 WL 7825448, at *4 (W.D. Wash. Sept. 24, 2018), *report and recommendation adopted*, No. C15-5943 BHS, 2019 WL 1356037 (W.D. Wash. Mar. 25, 2019).

If a substantial burden exists, the Court must then determine whether the regulation is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89. In making such a determination, the court considers a four-factor test.

*Id.* First, the Court must consider whether there is a "valid, rational connection" between the prison officials' actions and a legitimate government interest put forward to justify it. *Id.* "[I]f the prison fails to show that the regulation is rationally related to a legitimate penological objective, we do not consider [any] other facts." *Ashker v. Cal. Cep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003). However, if there is a valid connection, the Court next considers whether there are "alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. Next, the court considers what the impact will be on other prisoners and prison officials if the prisoner's accommodation is administered. *Id.* Finally, the Court should examine whether the prison officials have reasonable alternatives to the regulation. *Id.* "[T]he absence of ready alternatives is evidence of the reasonableness of the prison regulation." *Id.*; *McDaniels*, 2018 WL 7825448, at *4.

### e. Religious Diets and the Substantial Burden Inquiry

In the context of religious diets, the Ninth Circuit has held that inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987). Moreover, "adverse health effects from a prison diet can be relevant to the substantial burden inquiry." *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008). For instance, in *Shakur*, the Court found genuine issues of material fact precluded summary judgment as to whether the Muslim plaintiff was substantially burdened when provided a vegetarian diet that did not require him to eat non-Halal food. *Id.* Plaintiff indicated the vegetarian diet aggravated his hiatial hernia and caused excessive gas which interfered with the purity required for him to worship. *Id.* The Court found an issue of fact as to

whether plaintiff was substantial burdened in being forced to eat a diet causing "adverse physical effects" in order to comply with his faith. *Id.*

### C. DOC Diets

The DOC offers several different diets to meet prisoners' religious and medical needs. DOC policy incorporates nutritional goals set forth in both federal and state nutritional guidelines. Dkt. 114, Carney Decl., at 7. The relevant federal guidelines recommend no more than 2300 mg of sodium per day and no more than 1500 mg of sodium for certain subsets of the population such as those with hypertension. *Id.* The Washington state nutritional guideline implementation manual for institutions includes the same sodium recommendations. *Id.*; Dkt. 121, Exh. 1 and 2. The Mainline diet, which is eaten by the majority of inmates, provides approximately 2,900 calories each day, and inmates electing this meal option receive approximately 105 grams of protein, 95 grams of fat, and 3,200 milligrams (mg) of sodium daily. Dkt. 114, at ¶ 5. But the DOC also offers additional meal options for inmates to meet their religious needs and medical needs. *Id.* at ¶ 6.

Among the therapeutic diets offered by the DOC to accommodate specific medical needs is a "Lighter Fare" diet.[7] Dkt. 114 at ¶ 7. The Lighter Fare diet was designed to be lower in sodium, fat, and sugar, provides approximately 2,100 calories each day. *Id.* Inmates electing this meal option receive approximately 85 grams of protein, 60 grams of fat, and 2,400 mg of sodium daily. *Id.* An inmate can elect this diet, on their own, or it can be recommended by DOC Health Services staff. *Id.* Although

---

[7] The "lighter fare" diet was previously referred to as the "metabolic diet." Dkt. 114, at ¶ 7. The parties do not dispute that these terms refer to the same diet.

Health Services staff may recommend this diet, an inmate would always be able to decline a therapeutic diet and receive a preferred religious diet instead, should they choose to do so. *Id.*

Among the religious diets offered by the Department is a "Mainline Alternative Diet" ("MAD"). *Id.* at ¶ 8. The MAD is a vegan diet designed to accommodate religious diets which forbid consumption of meat and animal products, and which forbid consumption of pungent vegetables such as garlic and onion as well. *Id.* There is a process in place which allows inmates to elect a religious diet, such as the MAD, should they wish to receive such a diet. *Id.* Inmates electing the MAD diet receive approximately 2,800 calories each day, as well as approximately 95 grams of protein, 75 grams of fat, and 3,300 mg of sodium, daily. *Id.*

Another of the DOC's religious diets is a "Milk Mainline Alternative Diet" ("MMAD"). *Id.*, ¶ 9. This diet was introduced by the DOC on February 1, 2019. *Id.* This diet is identical to the MAD, except that it is not strictly vegan because a half pint of milk is provided daily, rather than a half pint of soy milk. *Id.* The half pints of milk utilized by the Department contain 102 calories and 107 mg of sodium; the half pints of soy milk utilized by the Department contain 100 calories and 120 mg of sodium. *Id.* The MMAD is therefore essentially nutritionally equivalent to the MAD in these regards. *Id.*

The DOC does not offer à la carte diet options or permit "mixing" of religious and medical diets. Dkt. 47, at ¶ 4.

**D. Defendants' Evidence**

In the current motion for summary judgment, defendants argue that the new MMAD diet meets plaintiff's religious and medical needs, and that plaintiff therefore

cannot demonstrate any substantial burden on the practice of his religion. In support of their motion, defendants submit the declarations of Brent Carney, Dietary Services Manager for DOC, Scott Light, PA-C, plaintiff's current primary medical provider, and Erin Lystad, PA-C, plaintiff's previous primary medical provider. Dkts. 114, 116, 117.

Mr. Carney's declaration states, that the DOC aims to provide meal service which aligns with Washington Governor Jay Inslee's Executive Order 12-06 and the Dietary Guidelines for Americans, which is published by the United States Department of Agriculture and the United States Department of Health and Human Services, and that these goals are incorporated into DOC policies. Dkt. 114, at 4. He indicates the Dietary Guidelines for Americans recommend that adults limit their daily sodium intake to 2,300 mg daily and recommend even less sodium, 1,500 mg, for certain subsets of the population such as those with hypertension. *Id.* He indicates the DOC "continues to evaluate opportunities for further reducing the sodium content of their menus and meal service." *Id.* He also states,

> if an inmate on the MAD or MMAD was concerned about the amount of sodium in their diet, they could simply not eat all of the food provided to them. This is possible without any nutritional deficit, because the MAD and the MMAD provide a generous amount of calories, approximately 2,800 calories daily. By simply eating only ¾ (75%) of each food item provided to them while on the MAD or MMAD, an inmate would receive approximately 2,100 calories daily and 2,470 mg of sodium daily, essentially equivalent to the Lighter Fare diet in terms of calories and sodium.
>
> An inmate on the MAD or MMAD, concerned about the amount of sodium in their diet, could also choose to eat some items provided to them, but not others. On most days inmates receiving MAD or MMAD receive two slices of vegan wheat bread (180 calories and 380 mg of sodium per slice) and at least one packet of peanut butter (380 calories and 240 mg of sodium). By eating the rest of their food throughout the day, but skipping the two slices of vegan wheat bread and a packet of peanut butter, inmates on the MAD or MMAD could receive approximately 2,250 calories and 2,420 mg of sodium daily, again essentially equivalent to the Lighter Fare diet in terms of calories and sodium. Of course, inmates could further self-restrict to receive even less in terms of calories and sodium, if they wanted to.

*Id.*, at 4.

Mr. Light's declaration states plaintiff has been diagnosed with high blood pressure (hypertension), high cholesterol (hyperlipidemia), and has a Body Mass Index (BMI) that indicates obesity. Dkt. 116. He states he believes plaintiff's high blood pressure can be controlled primarily by the medication he is currently prescribed and that when plaintiff takes his medication his blood pressure readings are within a normal range. *Id.* Mr. Light indicates that being overweight has a major impact on blood pressure and that this plays a significant role in plaintiff's hypertension. *Id.* Mr. Light states he is "also aware of professional guidelines recommending lower sodium diets and consuming less sodium would be another way for [plaintiff] to possibly achieve a more normal blood pressure. *Id.* Mr. Light states plaintiff "can play a role in managing his sodium intake while incarcerated by avoiding high sodium items from the commissary, and self-selecting within the meals provided by DOC." *Id.* He states "such self-selection could also have the benefit of helping Mr. Vincent manage his caloric intake and should further improve his weight." *Id.* He states it "appears likely [plaintiff] will continue to require antihypertensive medications, despite any lifestyle modifications he may make." *Id.* He states that he believes plaintiff's weight has a greater impact on his hypertension and that a modest reduction in weight would be far more effective than a reduction in sodium. *Id.* Mr. Light also attaches an article entitled "Overview of hypertension in adults" by Jan Basile, M.D., and Michael J. Block, M.D. which he believes supports opinion. *Id.* He states plaintiff "has complete control over the amount of calories he consumes" and that "ultimately, [he] believe[s] [plaintiff] can remain in

good health if he continues to take his blood pressure medications and eats reasonable portions of any given DOC diet …" *Id.*

Ms. Lystad's declaration states plaintiff has high blood pressure and high cholesterol but she "believe[s] both conditions are well controlled by medication." Dkt. 117. She states plaintiff is overweight but "overall I believe [plaintiff] to be in fairly good health." *Id.* She states she has "counseled [plaintiff] on the importance of diet and exercise to help manage his health and weight." *Id.* She states she recommended plaintiff elect the "Lighter Fare" diet. *Id.* She indicates she believes "this diet to be a good option for [plaintiff] because of [her] understanding that it has less calories and less sodium than the regular DOC Mainline diet" and that this "generally makes it a better option for inmates with high blood pressure, high cholesterol, and who struggle with their weight[.]" *Id.* She states that she does not believe that plaintiff's Lighter Fare diet "is instrumental in controlling his blood pressure." *Id.* She states in the past when plaintiff has remained on the Lighter Fare diet but willfully discontinued his medications, his blood pressure has gone up but when he chooses to restart his medications, his blood pressure goes back down to normal levels. *Id.*

**E. The Rule of Mandate**

Plaintiff argues that this Court is precluded by the rule of mandate from considering facts that were available to the defendants at the time they submitted the first motion for summary judgment, but were not presented until the second summary judgment motion. *See* defendants' first motion for summary judgment, Dkt. 46, filed 1-10-2017. This argument is not persuasive, because the only remedy now available to the plaintiff is declaratory and injunctive relief; the rule of mandate has flexibility when

the trial court is considering a claim for equitable relief. Equitable authority of the district court requires an examination of circumstances that exist at the time of trial, and therefore the rule of mandate bends to accommodate new facts showing changes in conditions, context and circumstances that are relevant to the need for, and scope of, any equitable remedy. *See Amado v. Microsoft Corp.,* 517 F.3d 1353, 1358-59, 1360-61 (Fed. Cir. 2008) (even if an appellate court has issued a mandate, the district court judge does not become strictly bound to follow the mandate in a mechanical fashion if circumstances warrant a change in an injunction).

Because the bench trial must include the facts that exist in discovery as to the conduct of individual defendants as well as currently relevant policies of the defendants who are sued in their official capacities, the specific acts and omissions of defendants, as well as any practices or customs that are relevant to the implementation of those policies by the defendants in this case, the Court allowed the parties to update the discovery to include data and witnesses concerning facts that occurred between the first summary judgment motion and the conclusion of plaintiff's appeal, as well as during the time between the date the mandate was issued by the Ninth Circuit, and the September 23, 2019 discovery cut-off. The Court may also amend the scheduling order and allow the parties to update discovery even after September 23, 2019 deadline, if the Court believes this is necessary in order to fully consider the substantive issues that pertain to equitable relief. *See generally, Broadcom Corporation v. Qualcomm Inc.,* No. SACV 05-467 JVS (RNBx), 2009 WL 10671467 (C.D. Cal. January 6, 2009) at *2, 4-5 (additional evidence about actual conditions must be considered by the trial court in determining whether an injunction is warranted, but under Fed. R. Civ. P. 60, the party offering new

evidence is required to show why the new facts could not have been discovered in a timely manner).

The district court must resolve, in the bench trial, any factual disputes concerning actual conditions and circumstances that pertain to the substantive issues under the First Amendment and RLUIPA, and apply the law to the facts to decide whether a violation has occurred, whether any violation was caused by any of the defendants in their individual or official capacity, whether a violation is ongoing, and whether any such violation would meet the legal requirements for declaratory or injunctive relief requested by plaintiff. The rule of mandate does not preclude the trial court from considering any of the defendants' newly proffered evidence, because the plaintiff's remedies are limited – he may only seek declaratory and injunctive relief – and equitable relief justifies discovery that allows for up-to-date information at trial (prospective remedy, rather than an assessment of damages that would be more retrospective). But the Court may nevertheless determine that some of the evidence should be excluded under Fed. R. Civ. P. 37 for purposes of summary judgment (and for purposes of trial, if the Court decides that is an appropriate pre-trial order) because the defendants have breached discovery rules and the Court may impose sanctions for these violations.

**F.  Defendants failed to comply with Fed. R. Civ. P. 26(a)(2)**

Plaintiff contends defendants have failed to comply with the timing requirements of Fed. R. Civ. P. 26 with regard to expert designations and that, the expert opinion portions of the declarations of Mr. Light and Ms. Lystad, should be stricken. Dkt. 120, at 22.

FRCP 26(a)(2) governs the disclosure of expert witnesses. *See* FRCP 26(a)(2)(A) (requiring that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705"). Expert witnesses are separated into two categories for purposes of determining whether certain disclosures are necessary: (1) Experts who are specially retained or employed to provide expert opinion in a trial or whose duties as employees of a party regularly involve giving testimony, and (2) hybrid fact/expert witnesses who are neither retained nor employed for litigation purposes but are permitted to give expert testimony and are called as witnesses who have opinions formed regarding matters that are within their personal knowledge of facts learned on the job. *Indianapolis Airport Authority v. Travelers Property Casualty Co. of America*, 849 F.3d 355, 370 (7th Cir. 2017) (interpreting current version of FRCP 26(a)(2)(B),(C)); *see also, Goodman v. Staples the Office Superstore, LLC,* 644 F.3d 817, 827 (9th Cir. 2011) (interpreting previous version of FRCP 26(a)((2)(B)).

The disclosure of a party's expert witness retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony must be accompanied by a written report containing: (1) a complete statement of all opinions the witness will express and the basis and reasons for them; (2) the facts or data considered by the witness in forming them; (3) any exhibits that will be used to summarize or support them; (4) the witness's qualifications, including a list of all publications authored in the previous 10 years; (5) a list of all other cases in which, during the previous four years, the witness testified as an

expert at trial or by deposition; and (6) a statement of the compensation to be paid for the study and testimony in the case. FRCP 26(a)(2)(B).

Even if the expert witness is not required to provide a written report pursuant to FRCP 26(a)(2)(B), the party designating the expert is nevertheless required to disclose the subject matter on which the witness is expected to present evidence under Rules 702, 703, or 705, and a summary of the facts and opinions to which the witness is expected to testify.[8] FRCP 26(a)(2)(C). *Merck v. Swift Transportation Company,* CV-16-01103-PHX-ROS, 2018 WL 6186439 (D. Arizona September 24, 2018) (excluding testimony of treating physicians that was not properly disclosed under FRCP 26(a)(2)(c) and noting that the Court in *Goodman v. Staples The Office Superstore, LLC,* 644 F.3d 817, 826 (9th Cir. 2011) was interpreting a version of Rule 26 that has since been revised); at *2; *see also, Muhammad v. Target Corp.,* No. 2:17-CV-08977-CAS(KSx), 2019 WL 2122983 (C.D. Cal. May 13, 2019) at *2.

Absent a stipulation or court order, the disclosures of expert witnesses must be made at least 90 days before the date set for the case to be ready for trial. FRCP 26(a)(2)(D).

---

[8] Rule 702, governs "Testimony by Expert Witnesses" and provides:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In contrast, Rule 701, governs "Opinion Testimony by Lay Witnesses" and provides:
> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

1    FRCP 37(c)(1) provides the penalty for failing to comply with the expert

2    disclosure requirements, providing that,

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), *the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial*, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

8    FRCP 37(c)(1) (emphasis added). Rule 37 "gives teeth" to the mandatory disclosure

9    requirements of Rule 26; Rule 37(c)(1) is a "self-executing, automatic sanction"

10   designed to provide a strong incentive to comply with Rule 26 disclosure requirements.

11   *Goodman,* 644 F.3d at 827. The exclusion of evidence not properly disclosed under

12   FRCP 26(a), is irrespective of the party's bad faith or willfulness. *See Yeti by Molly, Ltd.*

13   *v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

14         This case is set for trial on January 21, 2020. Dkt. 110. The pretrial scheduling

15   order directs that discovery should be completed by September 23, 2019, and because

16   there is not a separate section in the scheduling order about experts, the expert

17   disclosures were required to be filed by that date. *Id.* Defendants do not dispute that

18   they failed to disclose Mr. Light or Ms. Lystad as expert witnesses much less the

19   summary of facts or opinions, or any reports that may have been required by FRCP

20   26(a)(2)(B), (C), or (D) by September 23, 2019, nor do they dispute that to date they still

21   have not filed such disclosures. Instead, the defendants prepared declarations from Mr.

22   Light and Ms. Lystad in support of their motion for summary judgment, filed on October

23

24

25

23, 2019, without any discovery of expert witness summary or report, thus presenting these witnesses as percipient fact witnesses rather than expert witnesses.[9]

Because defendants did not file any expert witness disclosures with respect to Mr. Light and Ms. Lystad, pursuant to FRCP 37(c)(1), *they are "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial*," unless the failure was substantially justified or is harmless. Neither of these exceptions apply here.

Defendants argue that they were not required to provide the required expert witness disclosures because "FRCP 26(a)(1)(B)(iv) exempts cases 'brought without an attorney by a person in the custody of … a state' from the requirements of initial disclosures.'" Dkt. 123, at 8 (quoting FRCP 26(a)(1)(B)(iv)). The Court should reject this argument because the exemption provided in FRCP 26(a)(1)(B)(iv) applies to cases brought by *pro se* prisoners with respect to initial disclosures only -- which are governed by FRCP 26(a)(1). The defendants' contention that expert disclosures which are governed by FRCP 26(a)(2) are also subject to FRCP 26(a)(1)(B)(iv) is not viable, because the language of FRCP 26(a)(1)(B)(iv) plainly states that it is directed toward initial disclosures. And the Court should hold that regardless of the FRCP 26(a)(1)(B)(iv) exemption for initial disclosures, at this point in the litigation, Mr. Vincent has had representation by appointed counsel for well over a year. Counsel for the defendants should be working cooperatively with counsel for the plaintiff to ensure that all discovery obligations have been met. *See* FRCP 1 ("[The Civil Rules] should be construed,

---

[9] Even if the pretrial scheduling order did not set a clear discovery deadline, pursuant to FRCP 26(a)(2)(D), the parties' expert witness disclosures would have been due, at the latest, 90 days before trial, on October 23, 2019. Defendants do not dispute that they did not file such disclosures for Mr. Light and Ms. Lystad by that date, nor have they done so to date.

administered, and employed by the court and the parties to secure the just, speedy, and

inexpensive determination of every action and proceeding.").

Accordingly, pursuant to FRCP 26(a)(2), the Court recommends that all portions

of the declarations of Erin Lystad and Scott Light[10] which amount to expert opinion

testimony -- specifically, their medical opinion testimony regarding the impact of the

various diets served at SCCC on plaintiff's medical conditions and physical health – be

stricken for purposes of this motion. With respect to Mr. Light, this includes his entire

declaration with the exception of his factual statement, at paragraph 5, that plaintiff has

been diagnosed with high blood pressure (hypertension), high cholesterol

(hyperlipidemia), and he has a Body Mass Index (BMI) that indicates obesity.[11] Dkt.

116, at 2. With respect to Ms. Lystad, the Court should hold that her statements that

medical tests she did not administer "indicated good health", and that she does "not

believe" the lighter fare diet is instrumental to plaintiff's maintaining his health, constitute

---

[10] The Court notes that plaintiff did not request that any part of Mr. Carney's declaration be stricken.

[11] The Court notes that Mr. Light became plaintiff's primary medical provider in June 2019 but was not disclosed as an expert witness and has not been deposed. *See*, Dkt. 120, at 17; Dkt. 121; Dkt. 124. Defense counsel notes that he was aware that Mr. Light became plaintiff's primary provider sometime prior to August 22, 2019, but that he did not speak to Mr. Light and decide he might provide useful evidence until October 3, 2019. Dkt. 124, at 1-3. But the fact that counsel did not decide to speak to Mr. Light and decide to use his expert testimony until October 3, 2019, does not render his failure to disclose him as an expert substantially justified or harmless.

1  expert opinion testimony and should be stricken pursuant to FRCP 26(a)(2) for

2  purposes of this motion.[12] Dkt. 117, at 9, 11.[13]

3        Considering the remaining evidence, the Court should find that genuine issues of

4  material fact remain for trial as to whether the available diets and policies about how the

5  diets are provided to this specific plaintiff impose a substantial burden on plaintiff's free

6  exercise of his religion under RLUIPA and the First Amendment. The record shows

7  plaintiff has several chronic health conditions including high blood pressure, high

8  cholesterol, and obesity and that he has a family history of heart disease. In his

9  declaration in support of defendants' motion, Mr. Carney asserts that plaintiff could

10  simply "self-select" to eat ¾ of the MMAD meal and receive the same nutrition in terms

11  of calories and sodium as he receives on the lighter fare diet. But the record indicates

12  the lighter fare diet was prescribed or recommended for plaintiff by his provider, Ms.

13  Lystad, as a means of addressing his hypertension, cholesterol, and obesity. *See, e.g.*,

14  Dkt. 22, Vincent Decl., at 3; Dkt. 117. The record also contains a publication or

15  "brochure" on the lighter fare diet approved by Mr. Carney himself which advises that

16

17

18  [12] Ms. Lystad has been deposed but plaintiff's counsel and counsel objected to the portions of her testimony regarding her expert opinion on the medical tests she did not administer. *See* Dkt. 120, at 22-23; Dkt. 121, Exh. 3, Lystad Dep., at 97:17-19; *see also*, Dkt. 121, Exh. 1, Carney Dep., at 104:25-105:6; 107:22-108:1. It also does not appear that Ms. Lystad offered the opinion that she did not believe the lighter fare diet was instrumental to plaintiff maintaining his health in her deposition. Dkt. 121, Exh. 3. Thus, at least with respect to these portions of Ms. Lystad's declaration, the Court cannot conclude that plaintiff's failure to disclose Ms. Lystad as an expert witness was harmless.

21  [13] The Court recommends the expert opinion portions of Mr. Light and Ms. Lystad's declarations as described be stricken for the purposes of this motion pursuant to FRCP 26(a)(1). The Court notes, however, that, as noted above, the District Court Judge may amend the pretrial scheduling order to extend the discovery deadline if the Court deems it appropriate. The Court also does not opine in this Report and Recommendation as to whether Ms. Lystad and Mr. Light's expert testimony should be precluded at trial. The current motion is not a motion in limine; the parties may move separately for that relief if appropriate.

25

prisoners with high blood pressure, high cholesterol, and obesity, like the plaintiff, "should … follow" the lighter fare diet.[14] Dkt. 120, at 27, Dkt. 121, Exh. 4 at 2.

Viewing the evidence in the light most favorable to the plaintiff, the record indicates the lighter fare diet was intended, in part, to address the dietary concerns of people like plaintiff with chronic health issues of high blood pressure, high cholesterol, and obesity. If simply advising prisoners to "eat less" of the Mainline Diet or the religious diets such as the MAD and the MMAD was sufficient as a dietary policy to address chronic health issues such as high blood pressure, high cholesterol, and obesity, there would seem to be no reason to create a therapeutic lighter fare diet option. Plaintiff also points to evidence from defendants that the nutritional content of the DOC diets are not necessarily static but have changed over time and notes there is no indication that inmates are regularly provided with the nutritional information regarding the contents of the food in the MMAD. Dkt. 120, at 9; Dkt. 114, at ¶ 17. Thus a question of fact remains as to how burdensome it would be for the plaintiff, in practice, to try to track the nutritional, sodium and cholesterol content in the MMAD and eat only the amount that would equate to the the lighter fare diet. On this record, viewing the evidence in the light most favorable to the plaintiff, genuine issues of material fact remain as to whether plaintiff was substantial burdened in being forced to either eat a diet causing "adverse physical effects" (the MMAD) in order to comply with his faith, or to eat a diet that violated his faith (the lighter fare diet). *See Shakur*, 514 F.3d 878.

---

[14] The Court also notes that Mr. Carney's declaration does not appear to address the relative impact of the MMAD as opposed to the lighter fare diet on plaintiff's high cholesterol. Dkt. 114.

Even assuming, hypothetically, the Court were to modify or suspend the scheduling order for purposes of this summary judgment motion and for trial, and decided to consider all of the evidence submitted in support of defendants' motion, including the entirety of Ms. Lystad and Mr. Light's declarations, genuine issues of material fact remain as to whether defendants' conduct substantially burdened plaintiff's religious practice. Ms. Lystad states she "believe[s] both [plaintiff's high blood pressure and high cholesterol] conditions are well controlled by medication" and while plaintiff is overweight "overall [she] believe[s] [plaintiff] to be in fairly good health." Dkt. 117. She states that she does not believe that plaintiff's lighter fare diet "is instrumental in controlling his blood pressure" because in the past when plaintiff has remained on the lighter fare diet but willfully discontinued his medications, his blood pressure has gone up but when he chooses to restart his medications, his blood pressure goes back down to normal levels. *Id.*

Similarly, Mr. Light asserts that he believes plaintiff's high blood pressure can be controlled primarily by the medication he is currently prescribed. Dkt. 116. He states it "appears likely [plaintiff] will continue to require antihypertensive medications, despite any lifestyle modifications he may make." *Id.* He states he believes plaintiff's weight has a greater impact on his hypertension and that a modest reduction in weight would be far more effective than a reduction in sodium. *Id.* Mr. Light also attaches an article entitled "Overview of hypertension in adults" by Jan Basile, M.D., and Michael J. Block, M.D. which he believes supports this opinion. He also states plaintiff "has complete control over the amount of calories he consumes" and that "ultimately, I believe [plaintiff] can

remain in good health if he continues to take his blood pressure medications and eats reasonable portions of any given DOC diet …" *Id.*

However, elsewhere in the record Ms. Lystad and Mr. Light make several acknowledgments which, viewed in the light most favorable to plaintiff, contradict the above opinions and raise genuine issues of material fact as to whether the available diets substantially burdened plaintiff's religious practice.

For example, Ms. Lystad acknowledges the lighter fare diet has played at least some role in controlling plaintiff's blood pressure in recent years. *See* Dkt. 121, Ex. 3, Lystad Dep., at 71:5-72:7. She acknowledges she has "counseled [plaintiff] on the importance of diet and exercise to help manage his health and weight", that she recommended the lighter fare diet as a "good option" for dealing with plaintiff's blood pressure, cholesterol and weight, and that the lighter fare diet is generally a "better option" for people like the plaintiff with these conditions. *See* Dkt. 121, Ex. 3, Lystad Dep., at 16:16-17:1; Dkt. 117, Lystad Decl., at 2. Ms. Lystad also acknowledges that high blood pressure, cholesterol, obesity, and a family history of heart disease, are all risk factors for heart disease. Dkt. 121, Ex. 3, at 16:6-17:9, 18:20-24. And, plaintiff's declaration states that when he was diagnosed with high blood pressure, he was warned by his providers that his age, weight, and family history could risk serious health effects. Dkt. 122, at 3. For his part, Mr. Light also acknowledges that he is "aware of professional guidelines recommending lower sodium diets and consuming less sodium would be another way for [plaintiff] to possibly achieve a more normal blood pressure." Dkt. 116.

With respect to Ms. Lystad's and Mr. Light's statements about the effectiveness of medication, even if plaintiff's medications may currently have a somewhat greater effect in controlling his high blood pressure and cholesterol and maintaining his health, this does not mean that controlling his sodium and cholesterol intake through his diet does not also play an important role, and, as previously noted, Ms. Lystad, concedes that the lighter fare diet has in fact played a role in that respect. Furthermore, plaintiff presents evidence that his religion also restricts his use of artificial or manufactured drugs including medications and while the restriction on medications may be relaxed when it is critical to his health, his faith drives him to try to wean of the medications if they can be avoided. Dkt. 122, at 2. This evidence is relevant to the issue to be determined at trial of whether the diets available to plaintiff substantially burdened his religious practice.

In sum, even taking into account the entirety of the record submitted in support of defendants' motion, genuine issues of material fact remain as to whether the available dietary choices substantially burdened plaintiff's religious practice. Questions of fact remain regarding the methodology by which the defendants determine whether a particular dietary plan meets plaintiff's religious restrictions while at the same time has proper nutritional value to maintain plaintiff's health. In addition, there are issues of fact regarding the specific nutritional value and relevant effects on plaintiff's health, concerning the diets that are currently available to plaintiff. And, as the Ninth Circuit previously determined, genuine issues of material fact remain concerning whether, under the First Amendment, defendants can show that the *Turner* factors have been met and whether, under RLUIPA, defendants' conduct is both 'in furtherance of a

compelling governmental interest' and the 'least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000cc-1(a), citing 42 U.S.C. § 2000cc-2(b)) (emphasis in original).

Accordingly, the Court recommends that defendants' motion for summary judgment be denied.

## IN FORMA PAUPERIS STATUS ON APPEAL

In the event the Court declines to adopt this Report and Recommendation and grants defendants' motion for summary judgment, the Court would have to determine whether plaintiff's *in forma pauperis* status should continue on appeal. *See* 28 U.S.C. §1915(a)(3) ("an appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith"). The Court must determine whether such an appeal is frivolous or malicious, or whether it fails to state a claim on which relief may be granted. *See* 28 U.S.C. §1915(e)(2)(B)(i)&(ii).

There is no evidence that such an appeal would be frivolous or taken in bad faith. Accordingly, the Court recommends that in the event the Court declines to adopt the Report and Recommendation and grants defendants' motion for summary judgment, that plaintiff's *in forma pauperis* status should continue in the event of an appeal.

## CONCLUSION

Based on the foregoing discussion, the undersigned recommends the Court strike the expert opinion portions of the declarations of Ms. Lystad and Mr. Light submitted in support of defendants' motion as described above, and deny defendants' motion for summary judgment (Dkt. 118).

The parties have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6;

FRCP 72(b). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating this time limitation, this matter shall be set for consideration on **January 16, 2020**, as noted in the caption. **The parties must file any objections to the Report and Recommendation by January 16, 2020 and no response to the objections will be considered**.

Dated this 2nd day of January, 2020.

Theresa L. Fricke
United States Magistrate Judge